UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
NORWOOD COOPERATIVE BANK,           )
                                    )
       Plaintiff,                   )
                                    )   Civil Action No. 10-11647-JCB
v.                                  )
                                    )
RICHARD J. GIBBS,                   )
RUSSELL S. GRABAU,                  )
UNITED STATES OF AMERICA, and       )
P.A. LANDERS, INC.,                 )
                                    )
       Defendants.                  )
_____)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

September 13, 2012

Boal, M.J.

Plaintiff Norwood Cooperative Bank ("Bank") filed this interpleader action to obtain declaratory relief regarding the proper distribution of surplus funds from a foreclosure sale. A bench trial was held before this Court on May 14, 2012.[1] For the following reasons, the Court finds that the 2003 Mortgage (as defined below) constitutes a fraudulent transfer under Section 5(a)(1) of the Massachusetts Fraudulent Transfers Act.

I. PROCEDURAL BACKGROUND

On February 19, 2010, the Bank as the holder of a first mortgage on real property located at 285 Oldham Street, Pembroke, Massachusetts (the "Property"), foreclosed on the mortgaged

---

[1] All parties consented to the to the exercise of jurisdiction by a United States Magistrate Judge for all purposes and the case was reassigned to this Court on January 14, 2011. (Docket Nos. 6-8, 15 and 17).

-1-

Property by public auction. Complaint, ¶ 6, 7. After the satisfaction of the indebtedness to the Bank from the proceeds of the foreclosure sale, the Bank held surplus funds in the amount of $21,484.79 (the "Funds").[2] Complaint, ¶ 9.

On July 12, 2010, the Bank commenced this action in Plymouth Superior Court, seeking a declaration regarding the proper distribution of the Funds. On September 27, 2010, the United States removed the action to this Court. (Docket No. 1). Defendants Russell S. Grabau, the United States of America, and P.A. Landers, Inc. have asserted an interest in the Funds.[3]

Russell S. Grabau asserts an interest in the Funds based on a Mortgage on the Property dated October 29, 1999 and recorded on August 3, 2003 in Book 26120, Page 326 in the Plymouth County Registry of Deeds in the original amount of $25,000. Complaint, ¶ 10(b). The United States disputes Grabau's entitlement to the Funds.

The parties agree that the basis for the United States' claims is a Notice of Federal Tax Lien, which was properly recorded and perfected against Richard Gibbs at the Plymouth County Registry of Deeds, Book 36,360, Page 257, on September 16, 2008. Joint Trial Stipulations, ¶ 7 (Docket No. 42).[4]

The parties agree that the basis for P.A. Landers' claim to the Funds is a properly

---

[2] In the Complaint, the Bank stated that it was holding surplus funds in the amount of $21,860.88. Later, the Bank clarified that the correct amount is $21,484.79. The amount quoted in the Complaint was a mistake due to the Bank's failure to account for $376.09 that was paid for hazard insurance on the Property before the foreclosure sale. See Docket No. 14 at 2.

[3] Defendant Richard Gibbs was also named as a defendant in this action. On December 29, 2012, the Court entered default judgment against Richard Gibbs and he is "forever barred as to making any claim as to the surplus funds that is the subject of this interpleader action." (Docket No. 13).

[4] The Joint Trial Stipulations were agreed to by the United States, Grabau, P.A. Landers, and the Bank.

recorded and perfected execution at the Plymouth County Registry of Deeds, Book 36,426, Page 199-201, on October 7, 2008, and a properly recorded writ of attachment at the Plymouth County Registry of Deeds, Book 34,800, Page 241, on July 11, 2007. Joint Trial Stipulations, ¶ 2.

The sole basis for the claim asserted by the Bank is its attorneys' fees and costs incurred in this action. Joint Trial Stipulations, ¶ 3.

Because the Funds are to be distributed pursuant to the "first in time, first in right" principle, and because the Funds are insufficient to satisfy all of the parties' claims in this matter, the only issue to be resolved at trial was the validity of Grabau's claim.

The Court held a bench trial on May 14, 2012. Grabau and Gibbs testified. Thirty-four exhibits were admitted into evidence, including the transcript of the February 23, 2012 deposition of Robert Belanger, a former employee of the Bank.

The parties submitted proposed findings and conclusions of law on June 28, 2012. (Docket Nos. 54-55). Based on the record, the Court makes the following findings of fact and conclusions of law.

## II. ANALYSIS

### A. Findings Of Fact

1. Grabau and Gibbs have known each other since the late 1980s, have a close personal and business relationship, and consider each other "family." Transcript of May 14, 2012 Bench Trial ("TR") 35, 44-45, 57, 65, 72, 110. Gibbs was married to Grabau's niece, Karen Gibbs. TR 21, 70.

2. In the early 1990s, Gibbs started to work for Grabau's businesses. TR 21, 43, 70. At first, he worked for the Pembroke Country Club. TR 21, 70-71. Later, he also

worked for Russell S. Grabau & Co., Inc. ("Grabau Inc."), which was engaged in the business of residential construction. TR 22-23.

3. In connection with his duties for Grabau Inc., Gibbs regularly communicated with the Bank regarding construction loans. TR 77. Gibbs' contact at the Bank was Robert Belanger. TR 77. Belanger worked in the senior construction lending and commercial lending departments of the Bank. Ex. 34 at p. 11.

4. In 1994, Gibbs loaned $50,000 to Grabau and Grabau Inc. TR 25. Grabau Inc. needed the money in order to satisfy payroll obligations. TR 25. Gibbs testified that he acquired the money through an inheritance. TR 75.

5. The loan was evidenced by a December 14, 1994 promissory note in favor of Gibbs in the amount of $51,000. The promissory note was due and payable on or before March 14, 1995. Ex. 2.

6. On March 30, 1995, Gibbs, Grabau and Grabau Inc. extended the payment date to June 14, 1995 and increased the repayment amount to $52,000. TR 27, Ex. 3.

7. On September 20, 1996, Grabau and Gibbs executed a new promissory note with respect to the loan from Gibbs to Grabau and Grabau Inc. The new promissory note stated that $40,000 principal and $8,000 interest was due and outstanding. The September 20, 1996 note also provided for interest to accrue monthly at the annual rate of 8% until the "full total due" was paid and extended the repayment date indefinitely. TR 28, Ex. 4.

8. In 1999, Gibbs separated from his wife and left their home. TR 30, 44, 73. He lived at the Pembroke Country Club for a short period of time. TR 30, 47, 73.

Subsequently, he lived at a motel for approximately five to six months. TR 48, 73.

9. On April 21, 1999, Grabau and his wife entered into a Purchase and Sale Agreement to purchase the Property for $148,000. TR 30. The Purchase and Sale Agreement provided that it could be assigned to a nominee. Ex. 5.

10. Grabau had planned to purchase the Property for his daughter and her husband. TR 31. However, his daughter decided to buy a different home. TR 34.

11. The Property was contiguous to the Country Club. TR 31.

12. Gibbs, who was looking for a home, asked the Grabaus to transfer their purchasing rights to the Property to him. TR 34, 47, 74.

13. Gibbs contacted Belanger about applying for a loan to purchase the Property. TR 77, 122. Because Belanger did not work in the residential mortgage department, he referred Gibbs to Suzanne McGrath, who worked in residential loans. TR 86, 122.

14. Gibbs applied to Norwood Cooperative Bank for a loan of $100,000 to purchase the Property, secured by a mortgage on the Property. The balance of the purchase price and other adjustments was to be paid by Gibbs. Ex. 6, 14, 23. He did not indicate on the loan application form that he was borrowing, aside from the Bank's loan, any part of the purchase price. Id.; TR 81.

15. In his loan application, Gibbs stated that the source of the down payment for the purchase of the Property was a loan repayment from Grabau. Ex. 23.

16. In the time between September 20, 1996 and October 1999, Grabau had made

some principal and interest payments in satisfaction of the September 26, 1996 note. Ex. 29 at USA-000235, USA-000240. Gibbs reported these payments on his tax returns. Id. Grabau had also made payments on Gibbs' truck and school tuition for Gibbs' daughter, which Gibbs and Grabau agreed counted towards repayment of the September 20, 1996 note. TR 36, 47, 92.

17. In October 1999, shortly before the closing on the Property, Gibbs and Grabau determined that Grabau and Grabau Inc. owed him approximately $27,000 on the September 20, 1996 promissory note. TR 37. Because Gibbs needed approximately $50,000 for the down payment on the Property, Grabau agreed to loan him $25,000. Id.; TR 46.

18. In or around October 1999, Grabau loaned Gibbs $25,000 (the "Loan"). TR 51, 83. He also made a payment of approximately $27,000 in satisfaction of the September 20, 1996 promissory note. TR 82; Ex. 1.

19. On October 7, 1999, Gibbs wrote on the September 20, 1996 Promissory Note "Paid in full 10/7/99" and signed it. Ex. 4.

20. On October 8, 1999, the sale and purchase of the Property by Gibbs closed. TR 52.

21. On October 20, 1999, Gibbs executed a promissory note in favor of Grabau in the amount of $25,000. The note bore no interest and was payable upon the sale of the Property or upon the death of Gibbs, whichever occurred first. Ex. 17. The note was secured by a mortgage on the Property dated October 20, 1999 and recorded with the Plymouth County Registry of Deeds on November 3, 1999 (the

"1999 Mortgage"). Ex. 16. Both Gibbs and Grabau testified that the Loan was never paid back. TR 37, 53.

22. On March 24, 2000, Grabau executed a discharge of the 1999 Mortgage (the "Discharge"). The Discharge was recorded with the Plymouth County Registry of Deeds on May 18, 2000. Ex. 18.

23. Gibbs testified that he asked Grabau to discharge the Mortgage because, shortly after the closing of the purchase of the Property, he received a call from Belanger requesting that the 1999 Mortgage be discharged. TR 101, 123. According to Gibbs, Belanger stated that there had been an audit of the Bank during which the 1999 Mortgage was discovered. TR 101. Because there had been no disclosure of the $25,000 loan or the 1999 Mortgage during the application process, the Bank wanted the 1999 Mortgage discharged. TR 101.

24. Grabau testified that Gibbs asked him to discharge the 1999 Mortgage and he trusted Gibbs so he signed the Discharge even though the loan had not yet been repaid. TR 39.

25. During his deposition, Belanger testified that he has no recollection of making any phone calls to Gibbs regarding the 1999 Mortgage and that he would not have made such a call. Ex. 34 at p. 45. First, Belanger did not work in the residential mortgage department. Id. at p. 56. Second, before making such a call, he would have consulted with the Bank's attorneys to ensure that such a request was proper. Id. at p. 58. Finally, if he were to make a request that the 1999 Mortgage be discharged, he would have made such a request in writing. Id. at pp. 49-50.

26. Based on the evidence presented to the Court, including observations of the witnesses during their testimony, the Court does not credit the testimony of Gibbs with respect to the reasons for the discharge of the Loan, but it does credit his and Grabau's testimony that the Loan had not been repaid when the Discharge was executed and that it remains unpaid. In addition, it is against Gibbs' own interests to testify that the Loan remains unpaid.

27. As part of his divorce decree, Gibbs was required to maintain a life insurance policy naming his ex-wife and children as beneficiaries. TR 102. At some time in 2003, the life insurance policy lapsed because Gibbs had failed to pay the premiums. TR 102, 125. In lieu of the life insurance policy, Gibbs' ex-wife, Karen Gibbs, obtained an attachment against the Property in early August 2003. TR 102, 125.

28. Two or three days after Karen Gibbs obtained the attachment, on August 8, 2003, Gibbs executed a mortgage on the Property in favor of Grabau in the amount of $25,000 (the "2003 Mortgage"). Ex. 19. The 2003 Mortgage secured the Loan. Id. The 2003 Mortgage was purported to be dated October 29, 1999. Id. The 2003 Mortgage was notarized and recorded with the Plymouth County Registry of Deeds on August 8, 2003. Id.

29. Gibbs executed and recorded the 2003 Mortgage in order to secure Grabau's Loan to Gibbs. TR 125-127. Gibbs wanted Grabau to have security for the Loan and wanted Grabau's interest in the Property to have priority over his ex-wife's attachment. Id. Gibbs told Grabau that he was granting him the 2003 Mortgage

as a result of Karen Gibbs' attachment.  Id.

B.   Conclusions Of Law

1.   Standard Of Review

In an interpleader action, each claimant to the funds is regarded as a plaintiff and must successfully prove its right to the interpleaded funds by a preponderance of the evidence. Metropolitan Life Ins. Co. v. Jacques, No. 09-5353-cv, 2010 WL 3466571, at *1 (2nd Cir. Sept. 7, 2010); Marine Indemn. Ins. Co. of Am. v. Lockwood Warehouse & Storage, 115 F.3d 282, 289 (5th Cir. 1997).

The United States, however, as the party seeking to invalidate the 2003 Mortgage, bears the burden of proving that the 2003 Mortgage was fraudulent.  See In re Rowanoak Corp., 344 F.3d 126, 131 (1st Cir. 2003).

2.   The Federal Tax Lien

Title 26, United States Code, Sections 6321, et seq., creates a lien on "all property and rights to property" belonging to any person who, being liable to pay any tax, neglects or refuses to pay the tax after demand.  Id.; Bank One Ohio Trust Co., N.A. v. United States, 80 F.3d 173, 175 (6th Cir. 1996).  A federal tax lien (1) arises automatically and (2) is retroactive.  See 26 U.S.C. §§ 6303, 6321, 6322.

The tax lien arises by operation of law once the following three events have occurred: (1) the IRS properly assessed a liability; (2) the IRS sent the taxpayer timely notice and demand for payment; and (3) the taxpayer failed to fully pay the liability.  Id.  Once the tax lien arises, Section 6322 provides that it relates back to the date of the assessment.  26 U.S.C. § 6322.

The creation of a tax lien does not require a filing of public notice, and, once created, the

tax lien is effective against the taxpayer until the liability is satisfied or becomes unenforceable by reason of lapse of time. TKB Int'l, Inc. v. United States, 995 F.2d 1460, 1463 (9th Cir. 1993). However, a tax lien cannot be enforced as to mortgagees, purchasers for value, mechanics lienors, and judgment lien creditors, until such time as the IRS makes it visible by properly filing a Notice of Federal Tax Lien. 26 U.S.C. § 6323(a).

Under Section 6321, the tax lien attaches to all "property and rights to property." 26 U.S.C. § 6321. "The United States Supreme Court has described the statutory language as 'broad' and reflective of a congressional intent to 'reach *every* interest in property that a taxpayer may have.'" Bank One Ohio Trust Co., 80 F.3d at 175 (emphasis in original) (quoting United States v. Nat'l Bank of Comm., 472 U.S. 713, 719-20 (1985)). "Stronger language . . . could hardly have been selected to reveal a purpose to assure the collection of taxes." Id.

"Section 6321 does not create any property rights . . . [ but] it 'merely attaches consequences, federally defined, to rights created under state law.'" Id. (quoting United States v. Bess, 357 U.S. 51, 55 (1958)). Although state law defines the nature of the legal interests which the taxpayer has in property, the question whether a state law right constitutes property or rights to property under Section 6321 is a matter of federal law. Id.; see also Middlesex Sav. Bank v. Johnson, 777 F. Supp. 1024, 1027 (D. Mass. 1991). When looking to state law, courts must "consider the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them." United States v. Craft, 535 U.S. 274, 279 (2002).

The parties agree that the United States has a secured claim against the Property based on its Notice of Federal Tax Lien properly recorded on September 16, 2008. Joint Trial

Stipulations, ¶ 7.

        3.      Grabau Has Proven That Gibbs Owes Him $25,000
              And That Such Debt Is Secured By A Mortgage On The Property

As stated above, the Court credits the testimony of Grabau and Gibbs that Grabau loaned Gibbs $25,000 in or around October 1999. The Court also credits Gibbs and Grabau's testimony that the Loan was never paid back. Finally, the Court finds that Gibbs granted Grabau a mortgage on the Property in the amount of $25,000, which was recorded with the Plymouth Registry of Deeds on August 8, 2003. Accordingly, the Court finds that Grabau has proven by a preponderance of the evidence a claim to the Funds and that the basis for that claim is the 2003 Mortgage recorded on August 8, 2003.

Because Grabau is a mortgagee, the United States' tax lien on the Property cannot be enforced against him until such time as the United States filed a Notice of Tax Lien. The United States filed its Notice of Tax Lien against the Property on September 16, 2008. Accordingly, Grabau's claim to the Funds has priority over the United States' tax lien unless the Court finds that the 2003 Mortgage constitutes a voidable fraudulent transfer.

        4.      The 2003 Mortgage Constitutes A Fraudulent Transfer

The United States argues that the 2003 Mortgage was a fraudulent transfer under the Massachusetts Uniform Fraudulent Transfers Act, M.G.L. c. 109A, §§ 1, et seq. ("UFTA"). The UFTA provides, in relevant part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>     (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

***

(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

M.G.L. c. 109A, § 5(a). Thus, as to both present and future creditors, the UFTA makes a transfer[5] fraudulent if there is actual intent to hinder, delay or defraud. Id. In addition, the UFTA makes certain transfers fraudulent, regardless of the ability to prove actual intent (which the Court terms for purposes of this decision "constructive fraud"). Id. The United States argues that the 2003 Mortgage should be invalidated both as actual and constructive fraud. See USA Mem. at 16, 20.[6] The Court takes each argument in turn.

 a. <u>Actual Intent To Hinder, Delay Or Defraud Creditors</u>

"It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors." <u>Max Sugarman Funeral Home, Inc. v. A.D.B. Investors</u>, 926 F.2d 1248, 1254 (1st Cir. 1991). Accordingly, fraudulent intent is commonly shown through circumstantial evidence and inference. <u>Hasbro, Inc. v. Serafino</u>, 37 F. Supp. 2d 94, 98 (D Mass. 1999).

The UFTA provides a non-exclusive list of "badges of fraud" or indicia of actual fraudulent intent that the Court may consider: (1) the transfer or obligation was to an insider; (2)

---

[5] A "transfer" is defined to include "the creation of a lien or other encumbrance." M.G.L. c. 109A, § 2. Accordingly, the 2003 Mortgage is a transfer under the UFTA. See, e.g., <u>Cheswell, Inc. v. Premier Homes and Land Corp.</u>, 319 F. Supp. 2d 135, 140 (D. Mass. 2004). Grabau does not appear to contest that the 2003 was a transfer but he contests that the transfer was fraudulent under the UFTA. See Defendant Russell S. Grabau's Requests for Findings of Fact and Rulings of Law Late ("Grabau Mem.") (Docket No. 54) at 7-9.

[6] "USA Mem. __" refers to the United States' Amended Proposed Findings of Fact and Conclusions of Law (Docket No. 55).

the debtor retained possession or control of the property transferred; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. M.G.L. c. 109A, § 5(b); see also Clearone Comm., Inc. v. Chiang, 717 F. Supp. 2d 142, 146-47 (D. Mass. 2010); Rodriguez v. Montalvo, 371 F. Supp. 2d 3, 5-6 (D. Mass. 2005). While "the presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud." Hasbro, 37 F. Supp. 2d at 98 (internal citations and quotations omitted).

The Court finds that a confluence of several factors supports a finding that the 2003 Mortgage constitutes a fraudulent transfer. First, the Court finds that the transfer was to an "insider." The UFTA defines the term insider as "includ[ing] . . . a relative of the debtor." M.G.L. c. 109A, § 2. The term "relative" is defined as "an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined . . ." Id. The UFTA's definition of insider, however, is not intended to be limited to the listed subjects. In re Holloway, 955 F.2d 1008,

1010 (5th Cir. 1992).[7]  "Instead, 'the drafters provided the list for purposes of exemplification.'" Id. (quotations omitted).

The cases that have considered whether a transferee is an insider generally focus on two factors: (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length. Id. at 1011 (collecting cases).  Although at the time of the 2003 Mortgage Gibbs and Grabau were no longer related by marriage, both testified that they were very close and considered each other family.  TR 35, 44-45, 57, 65, 72, 110.  Indeed, Gibbs went to live at the Pembroke Country Club (which was owned by Grabau) shortly after he first separated from his wife.  TR 70, 47, 73.  In addition, Grabau testified that he did not charge Gibbs any interest on the Loan because "[Gibbs] was family, and I helped family out before and I've never charged them any interest."  TR 65.  Gibbs also worked for Grabau in various capacities over the years.  TR 21, 43, 70-71.  Given their closeness and the fact that the Loan and 2003 Mortgage did not have the indicia of an arm's length transaction (i.e., no interest charged, the Loan was payable upon the sale of the Property or the death of Gibbs), the Court finds that Grabau was an insider.

---

[7] Although Holloway involves the Texas Uniform Fraudulent Transfers Act, that decision is relevant to the Court's analysis.  The UFTA was first proposed to the states by the National Conference of Commissioners on Uniform State Laws in 1984 to update fraudulent conveyance law to be consistent with the Bankruptcy Code of 1978 and to respond to changes occurring in other areas of the law.  Daley, P., *The Modernization of Massachusetts Fraudulent Conveyance Law: The Adoption of the Uniform Fraudulent Transfer Act*, 82 MASS. L. REV. 337, 339 (1998).  The vast majority of states have adopted the UFTA.  Armstrong v. Collins, No. 01 Civ. 2437, 2010 WL 1141158, at *18 (S.D.N.Y. Mar. 24, 2010).  Massachusetts adopted the UFTA in 1996.  St. 1996, c. 157 (approved July 8, 1996 and effective Oct. 8, 1996) (codified as M.G.L. c. 109A).  This Court may look to the law of other jurisdictions that have adopted the UFTA for guidance in interpreting it as Massachusetts requires its version of the UFTA to "be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states which enact it."  M.G.L. c. 109A, § 12.

Second, the 2003 Mortgage was recorded only a few days after Karen Gibbs obtained an attachment on the Property. Ex. 19. More importantly, Gibbs specifically testified that he granted the 2003 Mortgage to Grabau in order to ensure that Grabau's claim would have priority over Karen Gibbs' interest in the Property. TR 126-128. He testified that he notified Grabau of Karen Gibbs' attachment on the very same day that it was entered by the Probate and Family Court and suggested that the 2003 Mortgage be recorded immediately in order to ensure that Grabau's Loan to Gibbs had priority over Karen Gibbs' attachment. TR 128.

Finally, the Court finds that the 2003 Mortgage was recorded at a time where Gibbs was experiencing financial difficulties. Indeed, the Probate and Family Court granted the attachment because Gibbs had failed to pay the premiums on a life insurance policy that he was supposed to maintain for the benefit of Karen Gibbs and their children and the policy lapsed. TR 126.

Given these factors and especially Gibbs' own testimony that the 2003 Mortgage was intended to place Grabau's claim ahead of Karen Gibbs' attachment, the Court finds that the 2003 Mortgage was intended to hinder, delay or defraud Karen Gibbs' claim.

Although the United States' claim against Gibbs did not arise before the 2003 Mortgage, the UFTA gives both present and future creditors the ability to set aside a transfer which was made with actual intent to defraud. M.G.L. c. 109A, § 5(a). The statute clearly states that a creditor may rely on Section 5(a), "whether the creditor's claim arose before or after the transfer was made," and the transfer was made with actual intent to defraud "any creditor." Id. (emphasis added). See also Hoult v. Hoult, 862 F. Supp. 644, 648 (D. Mass. 1994).[8] Because the Court

---

[8] Although Hoult was based on a prior version of the statute, it is instructive because both versions of the statute contain similar language in this respect. See G.L. 1032, c. 109A, § 7 ("Every conveyance made and every obligation incurred with actual intent . . . to hinder, delay or

-15-

finds that the 2003 Mortgage was intended to hinder, delay or defraud Karen Gibbs' claim, the United States may avoid the 2003 Mortgage under the UFTA.[9]

  b.  Constructive Fraud

Because the Court has found that the 2003 Mortgage was fraudulent under Section 5(a)(1) of the UFTA, it need not determine whether it was also fraudulent under Section 5(a)(2).[10] Nevertheless, the Court observes that the United States' argument that the 2003 Mortgage was fraudulent under Section 5(a)(2) fails for at least one reason: the United States has not shown that the debtor did not receive "reasonably equivalent value" in exchange for 2003 Mortgage.

The UFTA does not define "reasonably equivalent value." The UFTA does provide that "[v]alue is given for a transfer or obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . ." M.G.L. c. 109A, § 4(a). In this case, the Court finds that Gibbs did owe $25,000 to Grabau at the time of the 2003 Mortgage. Therefore, Grabau gave value for the 2003 Mortgage because it secured an

---

defraud either present or future creditors, is fraudulent as to both present and future creditors.").

[9] Once a creditor carries its burden of proving actual fraud, the transferee may defeat the creditor's fraudulent conveyance claim by proving that he received the transfer "in good-faith and for a reasonably equivalent value." M.G.L. c. 109A, § 9(a). The transferee bears the burden of proving good faith. Terry v. June, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006). In order to establish good faith, the transferee must prove that "he did not have knowledge of facts that should have reasonably put him on notice that the transfer was made in order to delay, hinder, or defraud creditors of the debtor." Id.; see also Armstrong, 2010 WL 1141158, at *19. In his proposed findings of fact and rulings of law, Grabau has not argued the defense of good faith. In any event, there is uncontradicted testimony that Gibbs told Grabau that he was granting him the 2003 Mortgage in response to the attachment obtained by Karen Gibbs. TR 125-127. Accordingly, the Court finds that Grabau has not met his burden of proof that he took the 2003 Mortgage in good faith.

[10] Grabau only offers arguments under Section 5(a)(2), not 5(a)(1). Grabau Mem. at p. 9.

antecedent debt. The Court also finds that the value given was "reasonably equivalent" because the amount of the 2003 Mortgage is equal to the amount of Gibbs' debt to Grabau. Accordingly, the United States has not proven that the 2003 Mortgage was fraudulent under Section 5(a)(2) of the UFTA.

5.  Remedy

In an action under the UFTA, a creditor may obtain, inter alia, "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." M.G.L. c. 109A, § 8(a)(1). Accordingly, the Court invalidates the 2003 Mortgage to the extent necessary to satisfy the United States' claim against the Funds.

It is not clear what is the exact amount of the United States' claim as of this date and whether any portion of the Funds will be available to satisfy any other claims. Accordingly, no later than September 27, 2012, the United States shall file a notice, with supporting documentation, stating the amount of its claim. No later than October 12, 2012, the parties shall file any objections to the amount of the United States' claim to the Funds and, should the United States' claim be less than the total amount of the Funds, a memorandum stating their respective positions with respect to the distribution of any leftover Funds.

III. ORDER

For the foregoing reasons, this Court finds that the 2003 Mortgage was a fraudulent transfer under the UFTA. No later than September 27, 2012, the United States shall file a notice, with supporting documentation, stating the amount of its claim. No later than October 12, 2012, the parties shall file any objections to the amount of the United States' claim to the Funds and, should the United States' claim be less than the total amount of the Funds, a memorandum

stating their respective positions with respect to the distribution of any leftover Funds.

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge